**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**

| | |
|---|---|
| Thomas Hibdon,<br>6412 Woodside View Dr., Dunkirk MD 20754<br>MD 20754 (Calvert County) | )<br>)<br>)<br>) |
| Robert C. Burns, Jr.<br>23634 Abraham Dr., Leonardtown, MD 20650<br>(Saint Mary's County),<br>On behalf of themselves and other similarly<br>Situated, | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )    Civil Action No. 8:14-cv-591<br>) |
| Safeguard  Properties, LLC<br>7887 Safegaurd Circle<br>Valley View, Ohio 44125 | )<br>)<br>)<br>) |
| Citimortgage, Inc.<br>1000 Technology Drive, O'Fallon, MO 63368 | )  JURY TRIAL DEMANDED<br>)<br>) |
| Bank of America N.A.<br>100 North Tryon Street, Charlotte, NC 28255 | )<br>)<br>) |
| Defendants. | ) |

## CLASS ACTION COMPLAINT

Plaintiffs Thomas Hibdon and Robert Burns ("Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned counsel, hereby file this Class Action Complaint against Defendant Safeguard Properties, LLC, ("Safeguard"), Citimortgage, Inc. ("Citimortgage") and Bank of America, N.A. ("Bank of America") and allege as follows, upon knowledge as to themselves and upon information and belief based upon review and analysis of information readily available, and other facts as set forth herein.

## JURISDICTION AND VENUE

1.      The claims asserted herein arise under and pursuant to alleged violations of the Fair Debt Collection Practices Act ("FDCPA"), the Maryland Consumer Debt Collections Act ("MCDCA"), the Maryland Consumer Protection Act ("MCPA"), and Maryland common law.  The action is brought by Plaintiffs individually and on behalf of all those persons adversely affected by Safeguard's unlawful debt collection practices.

2.      Jurisdiction is proper over the subject matter of this action pursuant to  15 U.S.C. §1692(k)(d) and 28 U.S.C. §1331.

3.      This Court has proper jurisdiction over Defendants because Safeguard, Citimortgage and Bank of America transact business and perform work and services in this jurisdiction. Defendants has availed themselves of this jurisdiction through its affiliates and agents.

4.      Venue is appropriate because the Defendants regularly conduct business in this jurisdiction and Plaintiffs reside within this District and Division.

## NATURE OF THE CASE

5.      This is an action based upon the FDCPA, MDCDA, MCPA, Conversion, Trespass, and Negligence in connection with Defendants' unlawful debt collection practices in the State of Maryland.

6.      After a borrower falls behind by more than 45 days on mortgage payments, a bank is permitted to "inspect" and/or "preserve" the property—usually once a month—to determine if it has been abandoned.

7.      Citimortgage and Bank of America contract with Safeguard for such services.

8.      Safeguard has been, and continues to be, accused of wrongfully locking people out of their homes by breaking in, changing locks and shutting off utilities before the foreclosure process was complete.

9.      Safeguard has been, and continues to be, accused of stealing personal property found in the homes which clearly evidences that the properties at issue have not been abandoned.

10.     Plaintiffs and the putative class have complained that Safeguard, through its agents and sub-contractors, have and continue to break into their homes and stolen, *inter alia,* family heirlooms, valuable artwork, furniture, jewelry, personal portraits, etc.

11.     This action is brought by Plaintiffs individually and on behalf of those persons whose personal property was taken, moved, or destroyed by Safeguard's unlawful practices.

## PARTIES

12.     Plaintiff Thomas Hibdon is a resident of Calvert County, Maryland, and was so at all times relevant to this action.  Plaintiff Thomas Hibdon is the owner of a detached, single-family home located at 3125 Howard Drive, Port Republic, Maryland 20676.

13.     Plaintiff Robert C. Burns, Jr. is a resident of Saint Mary's County, Maryland, and was so at all time relevant to this action.  He is the owner of a detached, single family home at 23634 Abraham Drive, Leonardtown, Maryland 20650.

14.     Defendant Safeguard Properties, LLC, is a Delaware Limited Liability Company registered to do business in the State of Maryland.

15.     Citimortgage, Inc. is a Missouri company doing business in the State of Maryland.  Citimortgage hired Safeguard to inspect and secure Plaintiff Hibdon's real property.

16.     Bank of America N.A. is a company headquartered in Charlotte, North Carolina doing business in the State of Maryland.  Bank of American N.A. hired Safeguard to inspect and secure Plaintiff Burn's real property.

17.     Citimortgage and Bank of America Corporation are referred collectively herein as the "Servicer Defendants."

## FACTUAL ALLEGATIONS

### Safeguard Properties

18.     Safeguard touts itself as "a turnkey resource for all aspects of default property management. As an industry leader, we pride ourselves on our attention to detail, our quick turnaround times, and our high levels of quality service in the field and in our corporate office."[1]

19.     To this end, Safeguard provides, *inter alia*, property inspection and property **preservation** services.

20.     On its website, Safeguard states that "As a first line of defense, timely and accurate property inspections provide critical information about the condition and occupancy status of a property so that steps can be taken to secure and protect it. Through early detection when issues and damages occur, properties sustain fewer and less severe damages, saving money and protecting their condition and value. Safeguard offers a full

---

[1] http://www.safeguardproperties.com/

range of inspections, including exterior occupancy checks, contact attempts with door hangers, and full interior inspections."[2]

21.      Exterior inspections have Safeguard inspectors "visit defaulted properties to verify the occupancy status, determine the exterior condition of the property, and inform the servicer of any adverse conditions. Most importantly, inspectors verify and report on whether the property appears to be occupied or vacant. They also provide a detailed description of the exterior condition of the property and report issues such as exterior damage, unsecured doors or windows and tall grass. Inspectors also will note the presence of "For Sale" signs, citations and notices."[3]

22.      By contrast, an interior inspection supposedly checks for "[d]amages such as mold, roof leaks and pest infestations [which] aren't visible from the outside of a property. Left unchecked, these issues can become expensive and difficult to repair and often strip a property of significant value. When identified early, however, damages often can be repaired for less than $500. Interior inspections are typically completed monthly, after the initial securing of a vacant property. Interior inspections comply with all investor and insurance guidelines."

23.      Safeguard also provides contact attempt inspections where "inspectors will make up to three attempts on behalf of a lender or servicer to provide contact information and an offer of assistance to delinquent borrowers. Multiple attempts generally occur 24

---

[2] http://www.safeguardproperties.com/Services/Property_Inspections.aspx

[3] http://www.safeguardproperties.com/Services/Property_Inspections/Exterior_Inspections.aspx

hours apart and at different times of the day to increase the chances of a successful contact. No interior access is attempted on these visits."[4]

24.     Property preservation has a different purpose, "to protect and preserve vacant properties."[5]

25.     For its property preservation service, "Safeguard works on behalf of loan servicers and through its national vendor network to keep vacant properties secure, safe and well-maintained inside and out. All work performed follows applicable investor and insurer guidelines. Our contractors evaluate and report potential damages or issues so they can be addressed in a timely and cost-effective manner. Safeguard assists its clients every step of the way, from default through foreclosure and conveyance."[6]

26.     Specifically, Safeguard provides securing, winterization, debris removal, convey maintenance, lawn maintenance and snow removal.[7]  Notably, it is only snow and debris removal that is promised—not the removal of personal property.

27.     The security service only comes into play "[o]nce an inspection determines that a property is vacant" at which time "Safeguard takes steps to protect it. A contractor will secure the property and perform a lock change according to investor or insurer guidelines. If the property is pre-foreclosure, the lock will be changed on a secondary door when possible. Post-foreclosure, all locks will be changed."[8]

---

[4]http://www.safeguardproperties.com/Services/Property_Inspections/Contact_Attempt_Inspection .aspx

[5] http://www.safeguardproperties.com/Services/Property_Preservation.aspx

[6] http://www.safeguardproperties.com/Services/Property_Preservation.aspx

[7] *Id.*

[88] http://www.safeguardproperties.com/Services/Property_Preservation/Securing.aspx

28.     Other than changing locks, Safeguard only promises that "[d]uring both pre- and post-foreclosure securing, properties receive regular inspections to identify damages and debris. In cold climates, plumbing will be winterized. All results are documented with photos and written reports, then submitted to the client."[9]  Again, notably, there is no mention of theft, the destruction of interior and exterior, or *causing* other damage to the property.

29.     Thus, through these services, Safeguard either directly, or indirectly, through sub-contractors assists lenders and loan servicers in collecting on mortgage debt.

30.     Upon information and belief, Safeguard is not a registered debt collector under Maryland law.

### Safeguard Contracts with Servicer Defendants

31.     Safeguard enters into written contracts with mortgage lenders and servicers, like Servicer Defendants, to provide property inspection and preservation services for properties whose owners are delinquent or have gone into default on their mortgages.

32.     According to Illinois Attorney General Madigan's investigation, through these contracts, Safeguard agrees to determine the occupancy status of the property and to provide property preservation services, such as boarding up doorways, changing the locks or padlocking the entrance, winterizing the home, and removing debris from unoccupied property.

33.     For each task Safeguard performs, Safeguard collects a pre-determined flat fee payment. For example, Safeguard often charges around $12 to determine whether a

---

[9] *Id.*

property is occupied or vacant. However, if Safeguard determines that a property is vacant, Safeguard may then charge substantially larger fees for "securing" the home, such as $100 to board up the doorway, $40 for padlocking the entrance, $60 for changing a lock, $75 to shut off utilities, $185 for winterizing the home, $35 per cubic yard for trash removal, and $120 for removing a car.

34.     Safeguard, then, is incentivized to deem properties it services as vacant even when they are not.

35.     In its contract with mortgage lenders and servicers, Safeguard represents that it "will supervise properly all [Safeguard] Personnel," which includes subcontractors of Safeguard.

36.     Upon information and belief, these contracts also contain certain clauses for the security, privacy, and protection of the homeowner/borrower and their possessions.

***Safeguard's Agents in the Field***

37.     Safeguard performs occupancy determination and property preservation services through a diffuse network of subcontractors supposedly trained and supervised by Safeguard.

38.      Safeguard, however, does not adequately train or supervise its subcontractors.

39.     Safeguard's subcontractors (or agents) perform the work pursuant to specific orders from Safeguard.

40.     In the contract with mortgage lenders or servicers, Safeguard also assumes liability and responsibility for the actions of its subcontractors.

41.     Safeguard, similarly, represents in this contract with mortgage lenders or servicers that it "shall provide knowledgeable, skilled, proficient and experienced employees and subcontractors to enable full performance ... with prudent, high quality mortgage servicing standards...."

***Defendants Fail to Deliver on Contractual Terms and Promises***

42.     Despite its promises and public statements, Safeguard, its agents and/or subcontractors, acting at Safeguard's direction, consistently and systematically enter and secure property clearly not abandoned.

43.     Despite its promises and public statements, Safeguard, its agents and/or subcontractors, acting at Safeguard's direction, consistently and systematically steal personal property.

44.     Despite its promises and public statements, Safeguard, its agents and/or subcontractors, acting at Safeguard's direction, consistently and systematically cause substantial damage to the homes' electrical systems, hot water heater, and/or other utilities and fixtures.

45.     The relevant document permits "Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause."

46.     Despite the underlying loan documents, the Servicer Defendants systematically ignore the "reasonable cause" language and engage Safeguard to enter property contrary to the Deed of Trust and Maryland law.

47.     Safeguard's process in inspecting and securing a home starts when Safeguard sends a work order to one of its subcontractors ordering that the subcontractor determine the occupancy status of the property.

48.     Safeguard does not provide its subcontractors with a clear standard for determining the occupancy status of property.

49.     Safeguard stresses to subcontractors that the subcontractors should make occupancy determinations quickly.

50.     Safeguard also tells its subcontractors that an occupancy status report of "unknown" is unacceptable and that the subcontractors will not be compensated for subsequent inspections to clarify the occupancy status.

51.     In some instances, Safeguard instructs its subcontractors to determine the occupancy status of the property after just one visit to the property or without making any effort to contact the potential household occupants.

52.     In many instances, Safeguard or its subcontractors inaccurately deem a property vacant when that property is, in fact, legally occupied.

53.     Safeguard or its subcontractors often deem property to be vacant despite clear signs that the property is not vacant.

54.     Once Safeguard or its subcontractor deems the property vacant, Safeguard orders its subcontractor to secure the property by gaining access to the property, turning off the water, placing a lockbox on the doors, and/or boarding the windows and doorways.

55.     In many instances Safeguard, through its subcontractors, also unlawfully removes personal property from the homes they are securing.

10

56.     Safeguard stresses to its subcontractors that the goal is to put each piece of property back on the market as quickly as possible.

57.     In many instances, however, the properties Safeguard orders its subcontractors to secure are not vacant or insecure.

58.     Instead, in many instances these properties are lawfully occupied and well maintained by homeowners or tenants.

59.     Nonetheless, Safeguard orders its subcontractors to dispossess legal occupants of their homes without legal justification.

60.     As such, in many instances and without legal justification, Safeguard, through its subcontractors: break into legally occupied homes, locks legal occupants out of their homes, turns off the water in legally occupied homes, and removes personal property from legally occupied homes.

61.     Safeguard takes advantage of instances where legal occupants are momentarily out of the house by using such opportunities to break into the home, winterize the property, remove personal items, and/or change the locks.

62.     In some instances, a subcontractor determines the property to be occupied, but Safeguard orders the subcontractor to secure the property anyway.

63.     Often, after removing the personal property of a legal occupant, Safeguard represents to the occupant that it will reimburse the occupant or return the personal property to the occupant.

64.     The occupant, however, is seldom reimbursed for the property, and the personal property is often not returned.

65.     Even when Safeguard learns that the property is occupied, Safeguard will repeatedly post notices on the home claiming that the property is vacant. This practice intimidates legal occupants into believing that Safeguard is trying to force the occupants to move out, despite the legal protections afforded to occupants of distressed property.

66.     Safeguard's practice of continually sending its subcontractors to occupied properties, locking legal occupants out of their homes, stealing their personal property, and wrongfully securing occupied homes is deceptive, injurious and oppressive to Maryland consumers.

67.     Moreover, Safeguard's practice of securing properties and forcibly evicting legal occupants without legal justification violates public policy.

***Misleading Notices***

68.     Safeguard issues notices to occupants that state that the foreclosing lender has the right to protect and secure the property, that the property has been deemed vacant by Safeguard, and that, if the property is not vacant, the occupant must contact Safeguard within a set number of days to forestall the dispossession.

69.     Safeguard provides its notices regardless of whether the property is in foreclosure or not.

70.     Safeguard provides these notices in instances where it does not have a good faith basis to believe that the home is vacant, such as in instances where the homeowner is in current or in ongoing loan modification negotiations with the loan servicer, or where the home is well maintained, secured and filled with personal items.

71.     Safeguard's notices, expressly or by implication, represent to the legal occupants that Safeguard is entitled to dispossess them of the property if the occupants fail to call Safeguard within a certain number of days (typically three).

72.     Safeguard's notices fail to inform legal occupants they have the legal right to remain in the property.

73.     Safeguard provides its notices to legal occupants before the confirmation of the foreclosure auction sale.

74.     Before a lender can foreclose and take possession of a home, it must provide a notice of intent to foreclose, an order to docket, and a notice of sale. Md. Code Ann. Real Prop. §§ 7-105.1-105.3. The notice of intent to foreclose must be given at least 45 days before filing the foreclosure action. It must be sent to the borrower by certified mail and first-class mail. Md. Code Ann. Real Prop. § 7-105.1. Maryland also provides for a mediation process. None of these procedures were followed before Servicer Defendants hired Safeguard to take control and possession of Plaintiffs' homes.

75.     As such, Safeguard represents to legal occupants that they are not entitled to live in their homes before the occupants are provided with legally-required notices which convey that they are potentially entitled remain in their homes.

*Complaints by Homeowners*

76.     In fact, people have posted complaints on websites and message boards noting that Safeguard, its agents and/or subcontractors had severely torn up the yard surround the property with deep ruts caused by the trucks and dumpsters used to haul off their personal belongings.

77.     Moreover, these same posters complain that extensive garbage and debris was left scattered all over the yard as well.

78.     By acting in the aforesaid manner, Safeguard, its agents and/or subcontractors, failed to perform their duties to inspect, protect, and/or preserve the properties.

79.     Safeguard, its agents and/ or subcontractors, acting at Safeguard's direction, have been accused of unlawfully forced entry into homes and primary residences by breaking windows, doors and locks on the property.

80.     Safeguard, its agents and/ or subcontractors, acting at Safeguard's direction, have been accused of ignoring barking dogs indoors and/or tampering with alarm systems before entering the home, changing locks, and stealing personal property or medical supplies.

81.     Safeguard, its agents and/or subcontractors, acting at Safeguard's direction, return to such property and unlawfully enter these homes again and again.

82.     Safeguard, its agents and/ or subcontractors, acting at Safeguard's direction, remove personal property, jewelry, wall hangings, portraits, furnishings and belongings therein, as well as fixtures.

83.     Safeguard, its agents and/or subcontractors, acting at Safeguard's direction, have been accused of destroying out-buildings on these properties including sheds and barns.

84.     Safeguard, its agents and/or subcontractors, acting at Safeguard's direction, have even mistakenly broken into and entered into *neighbors'* homes while on assignment to secure property.

85.     In fact, as one family notes, Safeguard *removed* the fence that separated the soon-to-be-foreclosed house and the neighbor's property *prior to* burglarizing the neighbor's home and barn.[10]

86.     One homeowner took to YouTube and posted a video of what Bank of America, via Safeguard, did to her belongings—on a property not mortgaged or serviced by Bank of America.[11]

87.     An online petition has been set up urging Safeguard to clean up its act.[12]

88.     Safeguard, its agents and/or subcontractors, acting at Safeguard's direction, have stolen business records, cars, and motorcycle gear.

89.     Between online complaints, legal complaints, and articles published by news outlets,[13] Safeguard's actions have been notorious.

90.     It has been reported that Safeguard, and its competitors, hire "felons or cheats drawn to a sector that boomed after the housing bubble popped, seeking opportunity in an industry with a history of underpaying its workers and neglecting

---

[10] http://blogs.lawyers.com/2013/03/foreclosure-error-robs-texas-couple-150k/ (Safeguard, under a Citimortgage contract, stole $150,000 in property consisting of boat, trailers, backhoe, and trunks of personal items which included love letters and a wedding dress—all from a *neighbor's* property).

[11] http://www.youtube.com/watch?v=PKuicunuVYM

[12] http://www.thepetitionsite.com/627/043/566/urge-safeguard-properties-to-come-clean/

[13] *E.g.,* http://www.rep-am.com/articles/2013/06/06/news/local/729080.txt; http://www.huffingtonpost.com/2013/04/29/safeguard-properties-complaints_n_3165191.html; http://www.huffingtonpost.com/2012/07/18/bank-contractors-break-ins_n_1682672.html; http://www.huffingtonpost.com/2013/04/foreclosure-bank-fraud-abuse_n_2999790.html; http://blogs.lawyers.com/2013/03/foreclosure-error-robs-texas-couple-150k/; http://dealbook.nytimes.com/2013/09/09/invasive-tactic-in-foreclosures-draws-scrutiny/; http://www.nytimes.com/2013/09/14/opinion/deceptive-practices-in-foreclosures.html?ref=foreclosures .

background checks. Fierce competition among the businesses that hire these contractors and weak supervision by banks" leads to the known problems outlined above.

91.     Upon information and belief, if a home is declared vacant (even if knowingly false), Safeguard and its agents stand to make *more* money from the contracts with Servicer Defendants.

92.     Upon information and belief, Safeguard and the Servicer Defendants have been sued by homeowners across the nation for wrongfully dispossessing homeowners and stealing personal property.

93.     In September 2013, the State of Illinois became the first state to sue property management firms such as Safeguard for wrongfully dispossessing homeowners in that State.[14]

94.     In the Illinois lawsuit, Attorney General Madigan portrays Safeguard and its subcontractors as bullies with a singular mission: get homeowners out, and quickly, even before the banks have a legal right to seize the properties.

95.     Despite the scores of complaints, despite the lawsuits, and despite the articles, Safeguard continually fails to provide proper training, oversight, and due diligence to the hiring and utilization of its on-site agents sent to inspect and preserve properties.

96.     Despite the notoriety, despite the scores of online complaints,[15] and despite the lawsuits, the Servicer Defendants continue to recklessly engage Safeguard's services.

---

[14] http://dealbook.nytimes.com/2013/09/09/invasive-tactic-in-foreclosures-draws-scrutiny/ ; http://www.housingwire.com/ext/resources/uploads/SAFEGUARD_PROPERTIES_COMPLAINT.pdf

*Plaintiff Hibdon's Experience*

97.     The first mortgage on Plaintiff Hibdon's Port Republic home was secured by a mortgage held and serviced by Citimortgage, Inc.

98.     Maryland public records show that Mr. Hibdon has never been in foreclosure.

99.     Mr. Hibdon missed his first mortgage payment on or about February or March of 2012.

100.    Nevertheless, upon information and belief, Citimortgage contracted with Safeguard to inspect and secure Mr. Hibdon's home.

101.    On August 16, 2012, Mr. Hibdon came home one evening from work and found a sticker on the front door of his home.  This sticker had "Safeguard" written on it and contained a telephone number.

102.    The sticker further indicated that someone from Safeguard had visually inspected Mr. Hibdon's home premises, and stated that the property was considered vacant because the grass was high.  However, Mr. Hibdon had recently had back surgery and could not cut the grass during the summer of 2012.

103.    The sticker warned to call Safeguard and inform it that the property is not vacant otherwise a crew would enter the home to winterize the property.

---

[15] *E.g.,* http://www.bbb.org/cleveland/Business-Reviews/property-management/safeguard-properties-llc-in-valley-view-oh-8000723/complaints; http://foreclosurepedia.org/safeguard-properties-an-archive-of-complaints/ ; http://foreclosurepedia.org/safeguard-properties-the-evolution-of-a-federal-racketeering-case-213-cv-00835cb/ ;
http://www.complaintsboard.com/complaints/safeguard-properties-c265331.html ;
http://www.ripoffreport.com/reports/specific_search/Safeguard+Properties

104.   Soon thereafter, still in August 2012, Mr. Hibdon visited the Law Office of Kurt Wolfgang and had his attorney call Safeguard and inform the representative that Mr. Hibdon's home was <u>not</u> vacant and that there was no need to winterize the property.

105.   As further precaution and on the same day he visited his attorneys, Plaintiff Hibdon attached a notice on his front door stating that "[i]f you are reading this you are trespassing on my property.  To contact me call Kurt Wolfgang attorney . . . . This property is under video surveillance and your presence has been recorded for legal action."

106.   In short, Plaintiff Hibdon did everything possible to notify Safeguard that the property was in fact <u>not</u> vacant.

107.   On August 23, 2012, a full week after Plaintiff Hibdon's call to Safeguard, he came home from work to find his house broken into and the locks changed.

108.   Mr. Hibdon immediately called the Calvert County police department and walked around the back of his house to the rear sliding glass door.

109.   Inside his home, he saw items from his refrigerator and freezer in the kitchen trash can and on the counter.

110.   Two Calvert County police officers arrived at the scene.  Together with Mr. Hibdon, they gained access to his house through a window that was found to have had a pane removed from its frame.

111.   Inside the home, Mr. Hibdon found the following:

    a.   His refrigerator and freezer had been emptied of approximately $300 worth of food.

18

b.        Oil was spattered on his stove, indicating that someone

other than himself had cooked a meal using his kitchen.

c.        Used tea bags were found in the kitchen sink.

d.        Other food and kitchen items missing.

e.        Upstairs, Mr. Hibdon found that a lockbox containing

valuable jewelry, precious metals, and antique coins had been

stolen.  The items inside the lockbox were nowhere to be found.

f.        DVDs, CDs and Wii games were missing.

g.        His personal passport and Federal identification card and

passport were missing.

112.    Since Mr. Hibdon's property had been burglarized in the past, Mr. Hibdon

had installed video cameras outside of his home for security purposes.

113.    Mr. Hibdon and the two police officers reviewed the video footage from

the time of the break in.  The video footage captured the following:

a.        A crew of men and a woman arriving at Mr. Hibdon's home

in a truck.

b.        The woman in the crew taking a look at Mr. Hibdon's

trespass notice.  The woman then makes a phone call while the

crew waits outside.  The woman gets off of the phone.

c.        One man in the crew, who was later revealed to be one

Joseph Eugene Green, III, then takes a ladder and leans it against

Mr. Hibdon's home.  Joseph Green then climbs the ladder out of

the camera's view.

        d.        Joseph Green reappears at Mr. Hibdon's front door and lets the entire crew inside.

114.    The morning after Mr. Hibdon discovered the break-in, he called Safeguard using the telephone number he had written down from the sticker notice, and asked the Safeguard representative to explain the break-in.

115.    Mr. Hibdon told the Safeguard representative that his attorneys had contacted the office to tell them the home was occupied and inquired as to why Safeguard had sent the crew.

116.    The representative indicated that Safeguard had made a mistake.

117.    Mr. Hibdon demanded of this representative that Safeguard must return everything that had been taken from him by its agents.

118.    Mr. Hibdon received no communication from Safeguard for the remainder of that day.

119.    Safeguard's "legal department" then began calling Mr. Hibdon daily.

120.    Mr. Hibdon, through his counsel, attempted to contact Safeguard's representative at its legal department repeatedly only to find out that the representative had resigned.

121.    Later in August, Mr. Hibdon, through his counsel, again corresponded with Safeguard and demanded the return of his stolen property.

122.    On or about August 30, 2012, an entity named "Glorious Industries" returned some of the property that was stolen to his counsel.

123.    The package that Glorious Industries sent Mr. Hibdon's belongings in indicates that Glorious Industries LLC is located at 5219 Kenmont Road, Oxon Hill, Maryland 20745.

124.    Upon information and belief, Glorious Industries LLC is a home cleaning services company that Safeguard employs to invade Maryland resident's homes and take their belongings without authority.[16]

125.    The package from Glorious Industries did not contain all of the property stolen from Mr. Hibdon.  Specifically, items not returned included precious metal and antique coins with an estimated value of approximately $10,000.

126.    Mr. Hibdon's passports and Federal identification card are still missing placing him at a verifiable increased risk of identity theft and fraud.  Experts place this increased risk anywhere from 4:1 to 9:1 increase.

127.    In September, 2012, Mr. Hibdon filed a police report against Safeguard with the Calvert County police.  From their investigation, Calvert County prosecuted one Joseph Eugene Green, III for the crime of theft.

128.    Green was charged and pled guilty to a charge of theft.  On March 21, 2013, Mr. Hibdon attended the sentencing allocution of Joseph Eugene Green, III in the District Court for Calvert County.

129.    During the allocution, Mr. Hibdon heard Green testify that he had a prior offense in the District of Columbia and that his current criminal charge was a violation of his parole.

130.    District of Columbia public records show that Green pled guilty to a felony in that jurisdiction on November 8, 1994.

---

[16] http://www.manta.com/c/mxg7yqv/glorious-industries-llc

131.     During the allocution of Green, Mr. Hibdon heard Green testify that when Green took the job, he was informed that the houses he was breaking into were abandoned and that they could take whatever they wanted.  This statement is on record.

132.     Safeguard never conducted a routine background check of the individuals it hired to break into people's homes for inspection and security services.  Had it done so, then Green's criminal history would have been discovered.

133.     In addition to the financial loss suffered as a result of the break-in of his home and theft of his belongings, Mr. Hibdon also has suffered extreme anxiety.  Mr, Hibdon spent many sleepless nights checking on every noise he heard in his home.  Mr. Hibdon installed two by fours over his windows after the break-in to ease his mind and provide extra security.

134.     Mr. Hibdon ultimately moved out of the property because he could not afford the mortgage payments on his home.  He moved to his new residence located in Anne Arundel County, Maryland, in May, 2013.

***Plaintiff Burns' Experience***

135.     Plaintiff Burn's home is secured by a mortgage owned by Fannie Mae and serviced by Bank of America at all times relevant to this action.

136.     Burns' home was not in foreclosure in 2012 and 2013.

137.     Upon information and belief, Bank of America nevertheless contracted with Safeguard to inspect and secure Mr. Burns' home.

138.     From June 2012 to January 24, 2013, Mr. Burns was away on business in San Diego.  His mother looked after the house on a monthly basis in his stead until October 2012.

139.     Mr. Burns' mother contacted him in late October, 2012 and informed him that she had visited his house and that "the bank" had "taken over" his home and that there were notices posted to his front door.  She unfortunately refused to give him any contact information from the notices.

140.     Mr. Burns returned to Maryland on January 24, 2013 but did not immediately return to his Leondardtown home.  He instead went to visit a friend in a neighboring county.

141.     However, he did contact a neighbor on that day and requested that she give him the phone numbers listed on the notices posted to his front door.

142.     Mr. Burns' neighbor gave him the phone number written on a notice posted on his front door by "B.A.C. Field Services Corporation," 1-866-515-9759.

143.     Mr. Burns called the phone number.  He was connected to a Safeguard representative.  When Mr. Burns asked what the situation was with his home, the Safeguard representative told Mr. Burns that the house was still in his name, that he could do as he wished with it, and admitted that there was a lock box at his home.  The representative, upon demand, gave Mr. Burns a combination for the lockbox.

144.     On January 24th or 25th, Mr. Burns had his friend Glen Elrod, a realtor, visit his home.  Mr. Elrod informed Mr. Burns that there was in fact no lock box on any of his doors.

145.     Furthermore, when Mr. Elrod walked around to the back of Mr. Burns' home, he found the rear sliding glass unlocked.

146.     Mr. Burns, before leaving for business in San Diego, had locked this sliding glass door (and all other doors) and set a broomstick down in the sliding groove of the door.

147.     Mr. Elrod went inside of the home, immediately noticed that the home had been ransacked.

148.     Mr. Burns had been the victim of assault and robbery in San Diego.  Upon hearing of the break-in and ransacking of his home, Mr. Burns suffered a mental breakdown and was hospitalized involuntarily from January 27th to February 1st.

149.     Mr. Burns returned to his home on February 2, 2013.

150.     Once at his home, he found that the front door handle set had been changed and locked.  The front door deadbolt was unlocked although Mr. Burns had locked it before leaving on business.  There was no lockbox to be found on any of the doors of his home.

151.     Mr. Burns obtained access to his home through the rear sliding glass door. He replaced the changed front door handle set.

152.     Mr. Burns saw that his home had been broken into, ransacked and many of his personal belongings had been stolen.

153.     Moreover, he found a partially empty bowl in his kitchen with cereal and milk inside of it, indicating that someone had enjoyed a meal after breaking into his home.

154.     Mr. Burns found evidence that his shower had been used as he saw towels that he had not used on his bathroom floor.

155.    Mr. Burns found Newport cigarette butts in his garage.  No one that Mr. Burns allows into his home smokes Newport cigarettes.

156.    Mr. Burns found that his garage door had been kicked open from the inside out.  Some of his possessions that had not been in the garage when he left were now in the garage.  It seems that the garage had been used as a staging point to facilitate the theft of Mr. Burns' belongings from inside the home to a vehicle waiting in his driveway.

157.    Mr. Burns noticed numerous missing items from his home, including missing antique posters, prints and memorabilia, and antique furniture.

158.    On his front door, Mr. Burns found a posted note from an entity called "B.A.C. Field Services Corporation" and "MCS, or Mortgage Contracting Services. B.A.C.'s note contained a telephone number: 1-866-515-9759.

159.    Mr. Burns called MCS and was told that it had been hired by Bank of America but had since been replaced—ostensibly by B.A.C.

160.    Mr. Burns called B.A.C. on February 2, 2013, which was a Saturday.  He was connected to a Safeguard representative who informed him that no one would be able to speak with him until the following Monday, which was February 4th.

161.    Upon Information and belief, Safeguard acquired Bank of America's home inspection branch, B.A.C. Field Services Corporation ("B.A.C."), in August, 2012.

162.    The BAC note posted on his door indicated that Mr. Burns' home had been "inspected" on October 3 and 25, 2012, and again on January 28, 2013.

163.    On February 3, 2013, Mr. Burns filed a police report with the Saint Mary's County Sheriff's Office for forced burglary.

164.     The Saint Mary's County Sheriff's Office has made no arrests in his case. His case is open and ongoing.

165.     Mr. Burns stayed at a hotel from February 3 to February 10, 2013.

166.     On February 3, 2013, Mr. Burns contacted Bank of America regarding Safeguard's actions on its behalf.  In response, Bank of America disavowed all responsibility and directed Mr. Burns to contact the police.

167.     Mr. Burns called Safeguard again on February 4, 2013, and spoke with Roland Bennett, who identified himself as an "escalation manager."

168.     Mr. Burns explained to Bennett that he was back home, the property was not vacant, that his home had been broken into and his belongings had been stolen by Safeguard's agents.

169.     Bennett informed Mr. Burns that Safeguard would start a "claim" on Mr. Burns' behalf.  Bennett also informed Mr. Burns that Safeguard had photographs that it had taken of the interior of Mr. Burns' home that showed the interior of his home in good order and other later photographs showing items missing.

170.     Thus, upon this information, it seems clear that Safeguard was aware of the theft and neither proactively reported it to Mr. Burns nor investigated such theft to recover the missing items.

171.     Besides a brief discussion in March, 2013, Mr. Burns did not hear from Bennett.

172.     On May 2, 2013, Mr. Burns emailed Bennett, expressing frustration at the lack of communication from Safeguard.  Bennett informed Mr. Burns that his case had been transferred to one Ronald Chamberlain, Jr., another Safeguard representative.

173.    Chamberlain, in turn, emailed Mr. Burns on that same day and informed him that he would have to contact Safeguard's customer service to move his claim for theft forward.  Attached to this email from Chamberlain was pictures taken from inside Mr. Burns' ransacked home.

174.    Mr. Burns called the phone number that Chamberlain had provided to him.

175.     On August 26, 2013, one Awilda Fegans wrote Mr. Burns' attorney a letter that indicated that Safeguard had inspected and found the property vacant on multiple times in 2012 and in 2013.

176.    Of note, several of these inspections noted by Fegans occurred <u>after</u> Mr. Burns had returned home on February 1, 2013:

• February 21, March 25, 2013-Inspection was performed on the property and reported vacant. [sic] images also shows no power on

• March 25, 2013- a property Inspection order and reported vacant

• April 24, 2013- property Inspection was performed, and reported vacant

• April 29, 2013-order created to complete a grass cut on the property

• May 11,2013- Legal department opened

177.    This was the first time that Mr. Burns learned that Safeguard <u>continued </u>to inspect his property after it was put on notice that Mr. Burns lived there and had filed a claim for theft.

178.    Safeguard, and its agent, were thus churning the account in order to intimidate Burns and to collect fees for unnecessary services.

179.    Despite the fact that no foreclosure had occurred on the property, despite the prior representations that pictographical evidence existed proving theft, and despite

the fact that Burns had been living in the home since February 10, 2013, Fegans stated: "To date, there is no evidence to support property being secured in error and/or removal of any personal items nor did any validity to claim find. To conclude our investigation vendor followed guidelines *and reported property accurately as viewed*." (emphasis added).

180.    After this letter by Fegans, Mr. Burns had additional discussions with Fegans.

181.    However, by October, 2013, Fegans informed Mr. Burns that there was no evidence of a break-in of his home or stolen property and that she was closing his file. She told Mr. Burns that she was tired of hearing from him and did not wish to speak to him any longer.

182.    Mr. Burns' insurance company, State Farm, had investigated the theft of Mr. Burns' belongings after he filed an insurance claim in early February, after he discovered the break-in of his home by Safeguard.  Mr. Burns had been in communication with State Farm about obtaining the photographs of the inside of his home that Roland Bennet had referred to in his conversation with Mr. Burns on February 4, 2013, described in Paragraph 167 above.

183.    On December 5, 2013, Mr. Burns received a package from State Farm containing photographs that State Farm identified as originating *from Safeguard*.

184.    Upon information and belief, Safeguard took these pictures from inside of Mr. Burns' home and provided them to State Farm.  Whoever actually took the pictures took them without Mr. Burns' knowledge or permission.

185.    These photographs are dated January 16, February 6 and 9, 2013.

186.    Some of the photographs dated January 16, 2013 shows items inside Mr. Burns' home that were stolen by the time he returned to his home on February 3, 2013, including antique Japanese prints and items of furniture.  If the dates on the photographs are to be believed, the photographs indicate that these items were stolen between January 16, 2013 and February 3, 2013.

187.    As identified above, the B.A.C. note reflects a visit on January 28, 2013.

188.    Comparing some of the photographs that Safeguard provided to State Farm from January 16th to the photographs from February 6th and 9th, it is clear that furniture and other personal belongings of Mr. Burns were ransacked and moved all through his home.

189.    Pictures from January 16th show furniture and other property of Mr. Burns in one location of his home.  Subsequent photographs from February 6th and 9th show these same items in different areas of his home.  Most notably, some of the furniture is shown by or inside of the garage, which Mr. Burns believes Safeguard used as a staging area to move his belongings out of his home.

190.    A photograph dated February 9, 2013 clearly shows an individual other than the photographer inside Mr. Burns' home.

191.    Mr. Burns has spoken with Bank of America representatives on numerous occasions during 2012 and 2013 about the break-in of his home and the theft of his belongings.

192.    During one such conversation, a Bank of America representative indicated that "a neighbor" had reported to it that men were removing Mr. Burns' belongings from his home.  This representative refused to identify this neighbor.

193.    Mr. Burns has persistently asked both Safeguard and Bank of America for an explanation as to why Safeguard obtained access to his home and what happened to his stolen property.

194.    No one at Safeguard or Bank of America has provided Mr. Burns with any semblance of an answer to his questions.  Indeed, representatives from both companies have been evasive at best, and at worst, outright misleading about the break in of Mr. Burns' home and the theft of his property.

195.    As a result of the break-in of his home and theft of his belongings, Mr. Burns has suffered extreme anxiety at the thought of being unsafe in his home.  Mr. Burns has spent countless hours trying to retrieve his property from Safeguard or Bank of America to no avail.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

196.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all members of the proposed class defined as follows: all persons whose mortgage loans were serviced by the Service Defendants and whose property was taken and/or destroyed by Safeguard or its agents.

197.    The members of this proposed Class are so numerous that joinder of all members is impracticable.  Class members may be identified through discovery from records maintained by Safeguard.

198.    Defendants have acted, or refused to act on grounds that apply generally to Plaintiffs and the Class, so that final injunctive or equitable relief is appropriate.

199.    Predominating common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including, but not limited to:

(a)    whether Safeguard violated the FDCPA;

(b)    whether the Defendants violated the MCDCA;

(c)    whether the Defendants violated MCPA;

(d)    whether the Defendants converted Plaintiffs' and the Class's property;

(e)    whether the Defendants committed trespass;

(f)    whether Safeguard was negligent in its hiring of sub-contractors;

(g)    whether the Servicer Defendants were negligent in hiring Safeguard;

(h)    whether the Plaintiffs and the Class suffered damages;

(i)    whether the Defendants caused Plaintiffs', and the Class's, damages;

200.    Plaintiffs' claims are typical of the claims of the Class, as all Class members were and are similarly affected by Safeguard's wrongful conduct.

201.    Plaintiffs will fairly and adequately represent and protect the interests of the other Class members and have retained counsel competent and experienced in class action litigation.  Plaintiff and their counsel are aware of no conflicts of interest between Plaintiffs and other class members.

## COUNT 1: Violation of §1692(f)(6) of the Fair Debt Collection Practices Act
### (*Against Safeguard only*)

202.    Plaintiffs incorporate by reference the factual allegations above.

203.    15 U.S.C. §1692(a)(6) defines "debt collector" as any person who uses any instrumentality of interstate commerce . . . [to collect] any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due asserted to be

owed or due another." This term also includes any person who uses any instrumentality of interstate commerce to enforce security interests.

204.   Safeguard is operating as a debt collector under this statute.

205.   A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt.

206.   Upon information and belief, Safeguard is not registered as a debt collector in the State of Maryland.

207.   It is a violation of the FDCPA for a debt collector to take or threaten to take any non-judicial action to effect dispossession or disablement of property if the property is exempt by law from such dispossession or disablement.

208.   It is a violation of the FDCPA for a debt collector to take or threaten to take any non-judicial action to effect dispossession or disablement of property if there is no present right to possession of the property claimed as collateral through an enforceable security interest.

209.   Safeguard violated this statute because Plaintiffs' property was exempt by law from dispossession or disablement at the time when Safeguard took or threatened to take the property.

210.   Safeguard had no legal right to possess Plaintiffs' home.  Its agents had no right to break into and possess Plaintiffs' real property.

211.   Safeguard had no legal right to Plaintiffs' personal possessions, no right to take such personal possessions for the benefit of the Servicer Defendants, and no right to remove such possessions from their homes.

212.    Safeguard violated §1692(f)(1) of the FDCPA when it collected or attempted to collect personal property that was not "expressly authorized by the agreement creat[ing] the debt or permitted by law."

213.    Defendant Safeguard violated §1692(f)(6) of the FDCPA for its' unfair and unconscionable attempt to collect a debt allegedly owed by Plaintiffs.

214.    Plaintiffs seek compensatory damages for all harm done to real property and personal property by Safeguard's FDCPA violation.

215.    Plaintiffs seek actual and statutory damages. 15 USCS §1692k(a)(1),(2).

216.    Plaintiffs seek recovery for the costs of this action including all attorney's fees and costs. 15 USC §1692k(a)(3).

### COUNT 2: Violation of §14-201 *et. seq.* of the Maryland Commercial Law Code: Maryland Consumer Debt Collections Act

#### (*Against All Defendants*)

217.    Plaintiffs incorporate by reference the factual allegations above.

218.    Under §14-201(b) of the Md. Commercial Code, a "collector" is any person collecting or attempting to collect an alleged debt arising out of a consumer transaction.

219.    Safeguard is acting as a debt collector.

220.    Under this statute, the Servicer Defendants are also acting as debt collectors.

221.    Safeguard is unlicensed to collect debts in the State of Maryland.

222.    Unlicensed collection of debts is a per se violation of the MCDCA.

223.    A "consumer transaction" is any transaction involving a person seeking or acquiring real or personal property, services, money or credit for personal, family or household purposes.

224.    The underlying mortgages are consumer transactions.

225.    When Safeguard, its agents or its principle on whose behalf they worked (the Servicer Defendants) acquired real or personal property from Plaintiffs, Defendants were collecting or attempting to collect an alleged debt that arose out of a consumer transaction.

226.    Under §14-202(8), a collector may not claim, attempt or threaten to enforce a right with knowledge that the right does not exist when collecting or attempting to collect an alleged debt.

227.    For purposes of the MCDCA, "knowledge" includes a reckless disregard as to the falsity of the existence of the right.

228.    When Defendants or their agents took property from Plaintiffs, it was enforcing or attempting to enforce a right, with knowledge that the right did not exist.

229.    A collector who violates §14-203 of the MCDCA is liable for any damages proximately caused by the violation, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury. Md. Com. Law §14-203.

230.    Plaintiffs seek compensatory damages for all harm proximately caused by Defendants' violation of the MCDCA, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury. Md. Comm. Law Code Ann. §14-203.

### COUNT 3: Violation of §13-301 *et seq.* of the Maryland Commercial Law Code: The Maryland Consumer Protections Act

#### (*Against All Defendants*)

231.    Plaintiffs incorporate by reference all factual allegations above.

232.    A violation of the MCDCA is a per se violation of this statute. Md. Commercial Law Code §13-301(14)(iii).

233.    Safeguard is an unlicensed debt collector, unlawfully collecting debt, through unfair means, in this State.

234.    The Servicer Defendants continue to hire Safeguard knowing, or recklessly disregarding, Safeguard's reputation for errors, theft and property destruction.

235.    Safeguard and the Servicer Defendants engaged in unfair or deceptive trade practices when they stole property from mortgagees whose property.

236.    Plaintiffs seek recovery in the form of compensatory damages for all harm proximately caused by Defendants' violation of the MCPA.

### COUNT 4: Class Action Conversion

#### (*Against All Defendants*)

237.    Plaintiffs incorporate by reference the factual allegations above.

238.    Defendants exerted distinct acts of ownership or dominion over the personal property of Plaintiffs in denial of, or inconsistent with, the property rights of Plaintiffs.

239.    As detailed above, Safeguard, and/or its agents, unlawfully removed numerous items from the property belonging to Plaintiffs.

240.    The removal of these items was intentional.

241.     Safeguard was acting as an agent for the Servicer Defendants when it performed these acts.

242.     The Servicer Defendants knew, or recklessly disregarded, the known problems with Safeguard's services.

243.     As a result, Plaintiffs were deprived of their property rights by Defendants.

244.     Due to the deprivation of Plaintiffs' property, Defendants are liable for conversion.

245.     Plaintiffs seek compensatory damages in the amount of the fair market value of the affected property plus interest.

246.     Safeguard and/or Citimortgage and/or Bank of America acted with actual malice when they entered Plaintiffs property and interfered with Plaintiffs' property rights in their personal belongings.

247.     Plaintiffs seek punitive damages due to Defendants' actual malice.

## COUNT 5: Trespass

### (*Against All Defendants*)

248.     Plaintiffs incorporate by reference all factual allegations above.

249.     Safeguard or its' agents intentionally walked upon, drove upon or otherwise entered Plaintiffs' real property.

250.     These acts constituted a physical invasion of Plaintiffs' real property in violation of the Deed of Trust.

251.     At the time of these acts, Safeguard was an agent to the Servicer Defendants.

252.    The Servicer Defendants directed Safeguard's intrusion upon Plaintiffs' land as part of its inspection and security services.

253.    As a result of these actions, Defendants are liable for trespass against Plaintiffs.

254.    While trespassing upon the property of Plaintiffs, Defendants' agents damaged and/or removed property from the owners of said property.

255.    Plaintiffs request legal and equitable relief to right these trespasses.

256.    To prevent these acts from reoccurrence, Plaintiffs seek injunctive relief in the form of mandatory background checks for all current and future employees of Safeguard or its subcontractors.

257.    Defendants acted with actual malice when their agents trespassed upon Plaintiffs' property.

258.    Punitive damages may be awarded in a trespass action as a penalty to the trespasser and as a warning to others where the alleged conduct shows, as here, malice, flagrant interference with the Plaintiff's right to possession, or other aggravating circumstances.

259.    Plaintiffs seek punitive damages against Defendants for trespass on real property because Defendants or their agents acted with actual malice involving the intentional wrongdoing, and/or such conduct amounted to a wanton, willful, or reckless disregard of the Plaintiff's right of possession.

### COUNT 6: Negligence

#### (*Against All Defendants*)

260.    Plaintiffs incorporate by reference all factual allegations above.

261.    Defendant Safeguard had a duty to inspect, protect, and/or preserve Plaintiffs' property.

262.    The Servicer Defendants had a duty to execute their underlying agreements with Plaintiffs in good faith.

263.    Defendants breached these duties when they caused individuals to unlawfully force entry into Plaintiffs' homes, removed personal property and inflicted substantial financial and emotional damage.

264.    The Servicer Defendants also breached these duties when it negligently hired Safeguard given its history of gross misconduct and extreme recklessness as described herein.

265.    Safeguard also breached these duties by not properly vetting and investigating its sub-contractors and/or the sub-contractors' hiring criteria and employees.

266.    Defendants' actions were a proximate cause of the injuries to Plaintiffs.

267.    Plaintiffs suffered injury in the form of loss or damage to chattels, damage to real property and emotional distress.

268.    Plaintiffs seek compensatory damages from Defendants for all damage relating to their breach of duty to Plaintiffs.

## COUNT 7: Breach of Contract

### (*Against All Defendants*)

269.    Plaintiffs incorporate by reference all factual allegations above.

270.    The Servicer Defendants had contracts with Plaintiffs, and the Class, which permitted reasonable entries on reasonable cause with prior notice of the inspection *and* of the reasonable cause.

271.    The Servicer Defendants breached the contract because they did not have reasonable cause to enter the properties as neither Plaintiff was in foreclosure.

272.    The Servicer Defendants breached the contract because they did not provide prior notice of inspection.

273.    The Servicer Defendants breached the contract because they did not provide prior notice that included any reasonable cause.

274.    The Servicer Defendants breached the contract because they did not make reasonable entries as the entries were destructive, unlawful, and resulted in significant loss of money and/or property.

275.    Upon information and belief, homeowners are an intended beneficiary of certain terms in the contracts between Safeguard and the Servicer Defendants relating to the privacy, security and safety of the borrower/homeowner and their possessions.

276.    Safeguard breached the contract because it violated those terms by instructing its agents (or its agents instructing their employees) that these agents or employees could take whatever of Plaintiff Hibdon's (or the Class's) possessions they wanted.

277.    Plaintiffs, and the Class, suffered damages as a result of Defendants' breach of these contractual terms.

### *PRAYER FOR RELIEF*

**WHEREFORE**, Plaintiff prays for judgment against the Defendants, and in favor of Plaintiffs and grant the following relief:

A) Compensatory and statutory damages;

B) Punitive damages due to the actual malice of Defendants or their agents;

C) Injunctive relief in the form of mandatory background checks for all current and future employees of Safeguard or its subcontractors;

D) Recovery of costs of this action, including attorney's fees;

E) Certification of this case as a class action;

F) Granting such other relief as this Court may deem just and proper.

Date: February 28, 2014

Respectfully Submitted,

**Law Office of Kurt Wolfgang, Chtd.**

/s/ Dean Park
Dean Park (MD Bar No. 30059)
9375 Chesapeake Street, Suite 113
La Plata, MD 20646
Tel: 301-934-6000
Facsimile: 888-601-2811
deanpark@wolfganglaw.com

/s/ Kurt Wolfgang
Kurt Wolfgang (MD Bar No. 03434)
9375 Chesapeake Street, Suite 113
La Plata, MD 20646
Tel: 301-934-6000
Facsimile: 888-601-2811
wolfgang@wolfganglaw.com

Tracy D. Rezvani
**REZVANI VOLIN & ROTBERT P.C.**
1050 Connecticut Avenue, N.W., 10th Floor
Washington, D.C. 20036
Phone:  (202) 350-4270 x101
Fax: (202) 351-0544
trezvani@rvrlegal.com