## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**THOMAS HIBDON, ET AL.,**           *
                                     *
     Plaintiffs                 *
                                     *
v.                                   *           Civil No.: **PJM 14-591**
                                     *
**SAFEGUARD PROPERTIES, LLC.,**      *
**ET AL.**                           *
                                     *
     Defendants                 *

## <u>MEMORANDUM OPINION</u>

Pursuant to Federal Rule of Civil Procedure 54(b), Thomas Hibdon and Robert Burns have asked the Court to reconsider its order entered on November 17, 2014, ECF No. 66, in which it granted the Motions to Dismiss filed by Safeguard Properties, LLC, CitiMortgage, Inc., and Bank of America N.A. with respect to Plaintiffs' claims for violation of the Maryland Consumer Protection Act ("MCPA"), Maryland Commercial Law Code § 13-301 *et seq.* Defendants oppose the Motion. For the reasons that follow, the Motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

### A.

The Court begins with a brief summary of the factual allegations contained in the Complaint.

At all times relevant to this action, Thomas Hibdon had a mortgage on his home in Port Republic, Maryland serviced by CitiMortgage, ECF No. 1, at ¶ 97, and Robert Burns had a mortgage on his home in Leonardtown, Maryland serviced by Bank of America, *id.* at ¶ 135. Plaintiffs do not dispute the validity of the instruments creating these mortgages. Among other things, these instruments provide that, after a borrower falls behind by more than 45 days on

mortgage payments, the servicer is permitted to "inspect" and/or "preserve" the property—typically once a month—to determine if the property had in fact been abandoned. *Id.* at ¶ 6. CitiMortgage and Bank of America had a contract with Safeguard to provide these services. *Id.* at ¶¶ 100, 137.

    1)  <u>Hibdon</u>

Hibdon failed to make his mortgage payments to CitiMortgage beginning in February 2012. *Id.* at ¶ 99.  On August 16, 2012, he came home to find posted on his front door a standardized sticker with "Safeguard" printed on it. *Id.* at ¶ 101. The sticker indicated that someone from Safeguard had visually inspected the premises of Hibdon's home, and indicated further that the property was considered vacant because the grass was high. *Id.* at ¶ 102. Hibdon, as it happens, had recently had back surgery and was not able cut the grass during the summer of 2012. *Id.* The sticker advised Hibdon to call Safeguard and inform it if the property was, in fact, not vacant; otherwise a crew would enter the home to winterize it. *Id.* at ¶ 103. Hibdon alleges that he notified Safeguard in numerous ways that the property was not vacant: he had attorney Kurt Wolfgang call Safeguard to inform a Safeguard representative that the property was not vacant, and attached his own notice to his front door stating that "[i]f you are reading this you are trespassing on my property. To contact me call Kurt Wolfgang attorney." *Id.* at ¶¶ 104-06.

On August 23, 2012, Hibdon came home to find his house broken into and the locks changed. *Id.* at ¶ 107. It was Safeguard's agents, he maintains, who broke into his home, consumed his food, changed his locks, and absconded with over $10,000 in personal property, including his federal identification badge and passport. *Id.* at ¶¶ 109-112. Video taken by surveillance cameras at the home in fact showed a crew of men and women arriving at the home in a truck, a member of the work crew looking at Hibdon's no-trespass notice, and that same

work crew member subsequently making a phone call. Thereafter, another member of the work crew was seen to use a ladder to enter the home—presumably through a window—then let the rest of the crew enter through the front door. *Id.* at ¶ 113. After Hibdon lodged a complaint with Safeguard, an entity known as "Glorious Industries" returned to him some of the personal property that had been removed. *Id.* at ¶ 122. Notably, one of the members of the work crew that had entered the property, Joseph Green, was later prosecuted and convicted of theft in connection with this incident. Hibdon says he attended Green's sentencing, and heard Green testify "that when [he] took the job, he was informed that the houses he was breaking into were abandoned and that they could take whatever they wanted." *Id.* at ¶ 127-131.

2) Burns

Although Burns's home was not in foreclosure in 2012 or 2013, *Id.* at ¶ 136, the Complaint does not allege that Burns was current on his mortgage payments during 2012 or 2013.[1] From June 2012 to January 24, 2013, Burns was away from his Leonardtown home on business in San Diego, California. *Id.* at ¶ 138. In late October 2012, his mother contacted him and informed him that "the bank" had "taken over" the house and that notices had been posted on the front door. For some reason, Burns's mother refused to give him any contact information contained in the notices, *id.* at ¶ 139, so on January 24, 2013 Burns asked a neighbor to give him the phone numbers listed on the notices, which turned out to have been posted by "B.A.C. Field Services Corporation," *id.* at ¶¶ 140-41. When Burns called one of the phone numbers, he was connected to a Safeguard representative who, on learning who Burns was, gave him a combination for the lock box at the home. *Id.* at ¶ 143. On January 24 or 25, Burns's friend visited the home, and discovered that it had been ransacked. *Id.* at ¶¶ 144-47. Burns, who had

---

[1] Defendants argued in their Motion to Dismiss that Burns did not dispute that he was in default on his mortgage. *See, e.g.*, ECF No. 26, at 11. In their Response, Plaintiffs appeared to concede that both Hibdon and Burns "had not been paying on their mortgages[.]" ECF No. 36, at 11.

previously been the victim of an assault and robbery in San Diego, submits that, on hearing of the ransacking, he suffered a mental breakdown and was voluntarily hospitalized until February 1. *Id.* at ¶¶ 148.

Burns returned to his home on February 2, at which time he discovered that his home had indeed been ransacked, that numerous items of personal property were missing, and that his locks had been changed. No lockbox was found. *Id.* at ¶¶ 150-57. On February 4, Burns was able to reach a Safeguard representative, whom he informed that the house was not vacant, but that it had been broken into, and his personal property "stolen." *Id.* at ¶¶ 167-68. The representative responded that Safeguard had photographs of the interior of the house showing it to be in good condition, as well as other photographs taken at some later date that showed the absence of personal property that should have been in place—which, according to Burns, implied that there had been a theft of the property, that Safeguard or its agents either committed the theft or were aware of it, and that they had not communicated these facts to him. *Id.* at ¶ 169. Burns says he spent several months communicating with Safeguard in an effort to get his personal property back, but to no avail. Burns filed a police report with the St. Mary's County Sherriff, but no arrests were made. The criminal investigation remains open and ongoing. *Id.* at ¶¶ 163-64

## B.

In their Complaint, Plaintiffs set forth seven claims for relief, including violations of the federal Fair Debt Collection Practices Act, the Maryland Consumer Debt Collections Act, the Maryland Consumer Protection Act, common law torts (Conversion, Trespass, Negligence), and Breach of Contract. They moved for class certification for all claims. Defendants moved to dismiss all claims and moved to strike the class claims.

The Court held a motions hearing on November 13, 2014. By oral opinion, the Court granted Defendants' Motions to Dismiss as to Plaintiffs' statutory claims, and granted Defendants' Motions to Strike Class Allegations. The Court, however, denied Defendants' Motions to Dismiss as to the common law tort and breach of contract claims. ECF No. 66.

Plaintiffs have since moved to reconsider one aspect of the Court's ruling: namely, its dismissal of the Maryland Consumer Protection Act (MCPA) claims. ECF No. 68. Defendants oppose the Motion. ECF No. 75.

## C.

The standard governing a motion for reconsideration of an interlocutory order is not altogether clear. While the standards articulated in Rules 59(e) and 60(b) are not binding in an analysis of Rule 54(b) motions, courts frequently look to these standards for guidance in considering such motions. *See Quigley v. United States*, 865 F. Supp. 2d 685, 699-700 (D. Md. 2012). Accordingly, courts have reconsidered interlocutory orders in the following situations: (1) where there has been an intervening change in controlling law; (2) where there is additional evidence that was not previously available; or (3) where the prior decision was based on clear error or would work manifest injustice. *See id.* (citing *Akeva L.L.C. v. Adidas Am., Inc.*, 385 F. Supp. 2d 559, 565-66 (M.D.N.C. 2005)).

Here, Plaintiffs argue that the Court made a clear error of law by applying the wrong legal test in dismissing their claims alleging that the Defendants engaged in "unfair trade practices" in violation of the MCPA. On further reflection, the Court agrees with Plaintiffs' argument, at least in part.

## D.

In Count III of the Complaint, which alleges violations of the MCPA, Plaintiffs state that "Safeguard and the Servicer Defendants engaged in unfair or deceptive trade practices when they stole property from mortgagees whose property [Safeguard and/or its agents entered in order to engage in preservation activities]." *See* ECF No. 1, at ¶ 235.

Section 13-303 of the Maryland Code, Commercial Law Article provides that "[a] person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in" the sale of consumer goods and services.[2] *See* Md. Code Ann., Com. Law § 13-303. Section 13-301 of the Maryland Code, Commercial Law "provides a *nonexclusive* list 'defining' unfair or deceptive trade practices." *Legg v. Castruccio*, 100 Md. App. 748, 758 (1994) (emphasis added). This list includes, for example, "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." Md. Code Ann., Com. Law § 13-301(2)(i).[3]

---

[2] The statute provides that a person may not engage in any unfair or deceptive trade practice in the sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services, or in the extension of consumer credit. *See* Md. Code Ann., Com. Law § 13-303 (1), (4) (emphasis added). The MCPA states that "consumer credit", "consumer debts", "consumer goods", "consumer realty", and "consumer services" mean, respectively, credit, debts or obligations, goods, real property, and services which are primarily for personal, household, family, or agricultural purposes. Md. Code Ann., Com. Law § 13-101(d)(1). Courts have applied the MCPA to unfair or deceptive trade practices undertaken in connection with services performed by mortgage servicers pursuant to a deed of trust. *See, e.g.*, *Allen v. CitiMortgage, Inc.*, 2011 WL 3425665, at *10 (D. Md. Aug. 4, 2011) (denying a motion to dismiss MCPA deceptive practice claims related to alleged misrepresentations by mortgage servicer regarding the status of plaintiff's existing mortgage and the status of plaintiff's requested loan modification); *Neal v. Residential Credit Solutions, Inc.*, 2013 WL 428675, at *4 (D. Md. Feb. 1, 2013) (denying a motion for summary judgment on MCPA deceptive practice claims related to alleged misrepresentations by mortgage servicer regarding whether plaintiffs were obligated to make mortgage payments).

[3] The prohibition against unfair and deceptive practices in the MCPA (one of the so-called "Little FTC Acts") was inspired by similarly worded provisions in the Federal Trade Commission Act, 15 U.S.C.A. § 45 ("FTC Act"), as well as by the model Unfair Trade Practices and Consumer Protection Act ("UTP-CPA"). *See* Jack E. Karns, *State Regulation of Deceptive Trade Practices Under "Little FTC Acts": Should Federal Standards Control?*, 94 Dick. L. Rev. 373, 374-75 (1990). The FTC Act provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C.A. § 45(a)(1). The model UTP-CPA sets forth three variations in its prohibitions against "[u]nlawful acts or practices." The first variation provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." *See* Council of State Governments, Unfair Trade Practices and Consumer Protection Law, at 6 (1970). This first variation resembles the general prohibition contained in the FTC Act as well as the "Practices generally prohibited" section of the MCPA,  Md. Code Ann., Com. Law §

Until 1994, Maryland appellate courts had not been called upon to distinguish between "unfair" and "deceptive" trade practices. The Federal Trade Commission and some federal courts, however, had by then already treated "unfair" and "deceptive" as separate and distinct prohibited practices. *See Legg*, 100 Md. App. at 758. Maryland presumably was soon to follow. As Section 13-105 of the Maryland Code, Commercial Law stated: "[i]t is the intent of the General Assembly that in construing the term 'unfair or deceptive trade practices', due consideration and weight be given to the interpretations of § 5 (a)(1) of the Federal Trade Commission Act by the Federal Trade Commission and the federal courts." Md. Code Ann., Com. Law § 13-105.

*Legg v. Castruccio* gave Maryland courts, in line with the FTC and other federal courts, the occasion to recognize a private cause of action for "unfair" trade practices separate and distinct from "deceptive" trade practices. *See* 100 Md. App. at 763-65; *see also Consumer Prot. Div. v. Luskin's, Inc.*, 120 Md. App. 1, 31 (1998) *aff'd in part, rev'd in part on other grounds and remanded*, 353 Md. 335 (1999). Relying on a lengthy analysis of the consumer unfairness doctrine espoused by the Federal Trade Commission, the Maryland Court of Special Appeals in *Legg* held that whether a trade practice was "unfair" under the MCPA should turn primarily on the type of the injury suffered by the consumer. The court determined that to be considered "unfair" under the MCPA, a trade practice must result in a: (1) substantial injury; (2) that is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces; and (3) it must not be the type of injury that a consumer could reasonably have

---

13-303. The second variation declares unlawful "false, misleading, or deceptive acts or practices," but does not use the term "unfair." The third variation sets forth an enumerated list of unfair and deceptive acts and practices, which resembles the "Unfair or deceptive trade practices defined" section of the MCPA, Md. Code Ann., Com. Law § 13-303. Accordingly, although the MCPA's prohibition against unfair and deceptive practices was influenced by these analogous provisions of the FTC Act and the UTP-CPA, the language of the relevant MCPA provisions varies somewhat from these precursors—most notably, in the Maryland state legislature's use of the phrase "trade practice."

avoided. *See Sager v. Hous. Comm'n of Anne Arundel Cnty.*, 957 F. Supp. 2d 627, 642 (D. Md. 2013) (citing *Legg*, 100 Md. App. at 767-71).

Plaintiffs argue that this Court's dismissal of their MCPA unfairness claim was based on a clear error of law because the Court did not base its ruling on the three-part *Legg*/FTC test. Instead, they argue, the Court dismissed the claim by surveying the nonexclusive list of unfair and deceptive practices defined in § 13-301, and concluded that the alleged house-breaking, destruction, and removal of property at issue in this case was not "unfair" because they lacked the element of deception that the Court believed the statute required.

During the hearing on the issue, counsel for Safeguard began by discussing the two theories of relief that Plaintiffs had alleged under the MCPA: deceptive practices and unfair practices. The Court observed:

> I think plaintiff is saying the unfair practice includes a deliberate policy of not just entering, because that may get -- you may get through the gate on that one by reason of the language on the mortgage, but once in, you wreak havoc. That's essentially -- is that an unfair practice? That's, essentially, I take that to be their position.

ECF No. 67, at 95:5-15.[4]

> Later in the colloquy, the Court asked:

> I mean, can it be an unfair practice to -- as a result of your arguably legitimate entry, can it be an unfair practice if property is deliberately destroyed, personal property deliberately destroyed within or whatever, can that be an unfair practice? I mean, it's wrong, but is it an unfair practice under this particular Consumer Protection Act?

> What are the case authorities? I am going to have to ask the plaintiff[s] that. What are the case authorities that show that anything like this constitutes an unfair practice under a consumer protection law?

> [ . . . ]

---

[4] The alleged wrongdoing by Defendants clearly did not involve an element of deception, which Plaintiffs do not dispute.

What does "unfair practice" mean? I mean, it's not really unfair competition because this is a consumer. When are you unfair to a consumer, under what circumstances? What's unfair?

ECF No. 67, at 96:3-16; 101:4-8.

Despite the Court's repeated entreaties to counsel to provide case authority construing the meaning of "unfairness" under the MCPA, counsel for Plaintiffs for some reason failed to call the Court's attention to either the *Legg* case, the FTC unfairness test, or to any state or federal authorities interpreting the unfairness provision of the MCPA—despite having cited such authorities in their briefs. Instead, counsel for Plaintiffs cited cases from the Northern District of Illinois, which applied a different consumer protection statute—the Illinois Consumer Fraud and Deceptive Business Practices Act—to a set of facts essentially similar to the case at bar. *See* ECF No. 62, at 106:8-107:22.

Without delving into the Maryland Court of Special Appeals's analysis in *Legg*, the Court proceeded to analyze the unfairness provision using ordinary tools of statutory construction, concluding that because unfair and deceptive practices are not discussed disjunctively in the MCPA, and because the MCPA contains no separate interpretation of the meaning of "unfair practice," an unfair practice must necessarily involve an element of deception, either through outright fraud or misrepresentation by omission or commission. *See* ECF No. 67, at 111:23-114:5. Based upon the facts alleged in the Complaint, the Court concluded that Plaintiffs had not stated a claim for unfair trade practices under the MCPA.

Presented now with controlling authority to the contrary, the Court concedes partial error, and proceeds to analyze whether Plaintiffs have stated a claim for relief under the *Legg*/FTC test.

**E.**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court will accept factual allegations as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.*

As indicated under the *Legg*/FTC test, to be considered "unfair" under the MCPA, a "trade practice" must result in a: (1) substantial injury; (2) that is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces; and (3) it must not be the type of injury that a consumer could reasonably have avoided. *See Sager*, 957 F. Supp. 2d at 642.

With regard to substantial injury, the *Legg* court noted that it "is not concerned with trivial or merely speculative harms. [ . . . ] In most cases a substantial injury involves monetary harm ... unwarranted health and safety risks may also support a finding of unfairness. On the other hand, emotional impact and other more subjective types of harm will not ordinarily make a practice unfair." 100 Md. App. at 768 (citing 1980 FTC Policy Statement on Unfairness) (internal citations omitted). *Legg* also noted that since evidence of consumer injury is not clear-cut in all cases, the FTC test allows a court to look to statutes or other sources of public policy to affirm that a practice is unfair. *Legg* cautioned that to the extent that a court "relies heavily on public policy to support a finding of unfairness, the policy should be clear and well-established. In other words, the policy should be declared or embodied in formal sources such as statutes, judicial decisions, or the Constitution as interpreted by the courts, rather than being ascertained from a general sense of the national values." *See id.*

As for countervailing benefits, the *Legg* court, again citing the 1980 FTC Policy Statement on Unfairness, noted that "'most business practices entail a balancing of costs and benefits to the consumer. [ . . . ] Since many trade practices provide a mixed bag of costs and benefits, the [FTC] will not find that a practice unfairly injures consumers unless it is injurious in its net effect." *See* 100 Md. App. at 768-69 (citing 1980 FTC Policy Statement on Unfairness) (internal citations omitted).

Finally, the *Legg* court noted that the guiding principle of the "not reasonably avoidable" prong is that "'[n]ormally we expect the marketplace to be self-correcting, and we rely on consumer choice—the ability of individual consumers to make their own private purchasing decisions without regulatory intervention—to govern the market. [ . . . ] Corrective action is viewed as necessary only when consumers are prevented from effectively making their own decisions. The purpose of such action is to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decision making." *See* 100 Md. App. at 769 (citing 1980 FTC Policy Statement on Unfairness) (internal citations omitted). How, then, does this analysis apply to the present case?

**F.**

Plaintiffs argue that what makes the trade practice at issue here "unfair" satisfies all three prongs of the *Legg*/FTC test. First, they argue that the alleged trade practice of breaking into homes and stealing and destroying valuable personal property is a substantial injury. Second, they argue that there can be no countervailing benefits to such a practice. Third, they argue that the practice was not reasonably avoidable because Plaintiffs had no prior relationship with Safeguard and did not participate in the decision of the mortgage servicers to enter into contracts

with Safeguard to provide property preservation services. As a result, Plaintiffs submit that they had no ability to negotiate independently of Safeguard and its subcontractors.

Defendants, on the other hand, argue that Plaintiffs have failed to set forth a cognizable "trade practice" under the MCPA. They point out that Plaintiffs have supplied no case authority supporting the notion that an act of entry into a dwelling, followed at some point by tortious conduct involving destruction or removal of property, amounts to a trade practice, much less an "unfair" trade practice contemplated by the MCPA. Rather, say Defendants, state tort law—trespass, negligence, and conversion, for example—already provides remedies for such alleged actions. Defendants also suggest that there are a virtually limitless number of lenders with whom Plaintiffs could have obtained mortgages with different terms concerning default and property preservation, so that any harms Plaintiffs may have suffered were reasonably avoidable.[5]

## G.

Taken literally, the *Legg*/FTC test has the potential to transform a considerable number of conventional torts committed by a mortgagee or its agents into claims under the MCPA. That is, an act could involve substantial injury, be of little or no benefit to the mortgagee and total detriment to the mortgagor and not be reasonably avoidable by the mortgagor. The case at bar is a good example. Destruction and removal of valuable personal property unquestionably constitute substantial injuries with no countervailing benefit to the consumer. Nor can it fairly be said that Plaintiffs could have avoided the destruction and removal of the property during preservation activities by shopping around for mortgages. As Defendants themselves point out, the clause affording a right of entry for property preservation is a standard (and in fact, statutorily required) element of a mortgage contract. *See* ECF No. 26, at 4-5. Moreover, there is

---

[5] The reason Plaintiffs' preference for relief under the MCPA becomes sharply apparent at this point. Unlike the traditional common law torts of trespass, conversion, or negligence, the MCPA authorizes the recovery of attorneys' fees. Md. Code Ann., Com. Law § 13-408(c).

no indication that borrowers have any say in selecting the property preservation company from an open and functioning marketplace—invariably, such companies are chosen by the servicer. Finally, according to the Complaint, even when Hibdon did contact Safeguard to instruct them that the home was not vacant and should not be entered, and even after he put up signs on the front door to the same effect, Safeguard or its subcontractors, he contends, broke in regardless.

But does this analysis justify an MCPA claim? Why don't causes of action in trespass, negligence, or conversion suffice?

The key element, in the Court's view, one that does not subsume these conventional torts, lies primarily in the significance of the word "practice" in the term "trade practice." As the Court views it, what matters is whether Plaintiffs have plausibly alleged that the theft and destruction of personal property during property preservation activities constitutes a "practice" of the trade under the MCPA, not merely an "act" that occurs in the course of trade activities, even if it may harm the consumer.

Plaintiffs in fact cite to a dictionary definition of a "trade practice" that points the way:[6] *viz.* "a method of competition, operating policy (as the use of standards of size, shape, and quality of materials), or business procedure common to members of a line of business or industry that may be formally adopted sometimes as a rule under government auspices." *See* Merriam-Webster's Unabridged Dictionary (2015) (emphasis added), *available at* http://www.merriam-webster.com/dictionary/trade practice. "Practice" is defined as "a repeated or customary action"; "the usual way of doing something."  Webster's Collegiate Dictionary (11th ed. 2012), at 974 (emphasis added).

---

[6] A dictionary definition may provide a "useful starting point," though not a dispositive answer, in determining a statute's meaning. *See Blue v. Prince George's Cnty.*, 434 Md. 681, 690 n.12 (2013).

In other words, it is not ordinarily the one time (or even necessarily the repeated) occurrence of an act that suffices to constitute the statutory tort of "unfair trade practice." These may all be isolated events. Rather, it is the "common" procedure, possibly "formally adopted," "repeated or customary," "the usual way" that, consistent with the *Legg* analysis, transforms the conventional tort into the statutory tort of "unfair trade <u>practice</u>."[7] Applied to the case at bar, then, the Court holds that while a business may be liable in tort for property destruction and theft committed by a business's agents, such acts of property destruction and theft are not unfair trade practices under the MCPA *unless they are the result of the operating policy or customary practice of that business*.

The differing allegations raised by Hibdon and by Burns illustrate this distinction. The Complaint alleges that, at the criminal allocution of apparent Safeguard agent Joseph Green, Hibdon heard Green testify that when he took the job, he was informed[8] that the houses he was entering into were abandoned and that he and his crew could take whatever items they wanted. Assuming the truth of this factual allegation, the Court finds it plausible to infer that the alleged entry, property destruction, and property removal wrought by the Safeguard subcontractors constitute not merely tortious actions committed by an agent or agents during the course of his or

---

[7] In arguing that such actions are not "trade practices," Defendants cite the preamble to the MCPA, which states that the "General Assembly recognizes that there are federal and State laws which offer protection in these areas, especially insofar as consumer credit practices are concerned, but it finds that existing laws are inadequate, poorly coordinated and not widely known or adequately enforced." Md. Code Ann., Comm. Law § 13–102(b)(2). Defendants conclude, based on this language, that the MCPA only provides a remedy for forms of wrongdoing not covered by traditional theories of tort and contract liability for which no remedy would otherwise be available to an aggrieved consumer. *See* ECF No. 75, at 4-5. But Defendants' reading of the MCPA preamble is strained. Far from finding that <u>no</u> remedy was available for unlawful practices in consumer transactions prior to the enactment of the MCPA, the General Assembly found that remedies <u>were</u> available. The Maryland Court of Appeals has held, "the Legislature's purpose in enacting the Consumer Protection Act was to <u>supplement</u> existing federal and state laws which it found to be 'inadequate, poorly coordinated and not widely known or adequately enforced.'" *See Consumer Prot. Div. Office of Atty. Gen. v. Consumer Pub. Co.*, 304 Md. 731, 761 (1985) (quoting Md. Code Ann., Comm. Law § 13–102(b)(2)) (emphasis added). The Court concludes that the mere fact that allegations of a single event of alleged wrongdoing may make out a common law claim or claims does not mean that the same allegations cannot also make out an MCPA unfairness claim.

[8] The Complaint does not specify whether Green was saying he was informed by Safeguard or a Safeguard subcontractor, but for present purposes, the Court will assume he was.

their duties, but well beyond that, an instance of an agent or agents carrying out an <u>articulated</u> <u>company policy</u>. Plaintiffs suggest that Safeguard—at the behest of the mortgage servicer Defendants—allowed or encouraged its subcontractors to steal property in order to bully delinquent homeowners into paying up or giving up their foreclosure rights without a fight, which may or may not hold true. But, notably, this is the same inference that at least two Judges in the Northern District of Illinois found plausible in construing the similar (but not identical) unfairness standard under the Illinois MCPA analogue.[9] *See, e.g.*, *Bywater v. Wells Fargo Bank, N.A.*, 2014 WL 1256103, at *4 (N.D. Ill. Mar. 24, 2014); *Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817, 826-27 (N.D. Ill. 2013). The Court also notes that it is plausible that Safeguard (or Safeguard's subcontractors) may have allowed or encouraged their employees to loot the possessions of purportedly abandoned homes, perhaps in order to offer these employees an additional benefit at no cost to Safeguard. In either case, this Court finds that Hibdon has sufficiently alleged that the entry, property destruction, and property removal that he suffered during Defendants' "home preservation" activities constitute a "trade practice" under the MCPA. At the Motion to Dismiss phase, therefore, Hibdon has stated a claim for relief under the MCPA's prohibition against "unfair trade practices."

Burns, by way of contrast, has not adequately alleged that the entry, property destruction, and property removal that he suffered constitute a trade practice under the MCPA. Unlike Hibdon—who alleges, based on security camera footage and state court criminal proceedings, that a Safeguard agent or sub-agent (Joseph Green) committed the entry, property destruction, and property removal—Burns asks Court to infer that Safeguard's agents committed the entry,

---

[9] While Maryland has adopted the 1980 FTC Policy Statement on Unfairness as the standard for unfairness claims under the MCPA, Illinois continues to rely on the pre-1980 FTC Policy Statement criteria for unfairness; *e.g.*, the so-called "Cigarette Rule." *See* Michael M. Greenfield, *Unfairness Under Section 5 of the FTC Act and Its Impact on State Law*, 46 Wayne L. Rev. 1869, 1914 (2000). The 1980 FTC Policy Statement cabined the types of consumer injury that unfairness claims previously brought under the Cigarette Rule could reach, importing a cost-benefit analysis requirement and narrowing the use of public policy as a basis for finding unfairness. *See id.* at 1874-78.

property destruction, and property removal because Safeguard agents were inside his home at or about the time that his possessions were ransacked and the property removal effectuated. While it may be that Safeguard's agents were indeed the ones who committed the property destruction and property removal, it is equally plausible that they were merely negligent in leaving open Burns's rear sliding glass door after they completed their property preservation activities, thereby facilitating the entry of unknown third parties who committed the property destruction and property removal.[10] In any event—critically—unlike Hibdon, there is no factual allegation in the Complaint that the Safeguard employees or subcontractors who <u>Burns</u> alleges committed property destruction or took his property did so as a result of an <u>operating policy or customary business practice</u> of Safeguard. The most that Burns can say is that Safeguard's agents took similar actions at least once in Maryland (i.e. with respect to Hibdon's home in Calvert County) and on a few other occasions against other homeowners in Illinois.[11] But assuming that such evidence would be admissible at trial in Burns's case—a questionable proposition—it still would not demonstrate that in his case individuals acted pursuant to a policy or custom of the mortgage servicer. In the Court's view, Burns has not, at least at this initial juncture, plausibly alleged that the Defendants' alleged destruction of his property or removal of his personalty constitute an unfair trade practice under the MCPA.[12]

### H.

For these reasons, Plaintiffs' Motion to Reconsider, ECF No. 68, is therefore **GRANTED-IN-PART** and **DENIED-IN-PART**. Defendants' Motions to Dismiss Count 3:

---

[10] This latter possibility is supported to some extent by the facts pleaded in the Complaint indicating that one or more persons may have been squatting on the property, e.g. dishes and bath towels had been used, and cigarette butts were found on the floor. *See* ECF No. 1, at ¶¶ 153-55.

[11] Burns also cites newspaper reports of homeowners in Texas, Arkansas, and other states who have complained of such practices by Safeguard. *See, e.g.,* ECF No. 1, at 13-16.

[12] Should Burns develop, in the course of discovery, more plausible evidence that Safeguard agents either destroyed or removed his property pursuant to a policy or customary business practice, he can always seek leave of Court to amend his Complaint to revive his MCPA claim.

Violation of §13-301 *et seq.* of the Maryland Commercial Law Code: The Maryland Consumer Protection Act are now **DENIED** as to Plaintiff Hibdon's claim that Defendants engaged in unfair trade practices under the MCPA, but are **GRANTED** as to Plaintiff Burns's claim that Defendants engaged in unfair trade practices under the MCPA.

A separate Order will **ISSUE**.

_____/s/_____
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**July 9, 2015**